UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

MICHAEL DOLAN, SR., and MICHAEL DOLAN, JR.,

               Plaintiffs,

     -against-                                          **AMENDED COMPLAINT**

NEW HYDE PARK FIRE DISTRICT, COUNTY OF
NASSAU, RICHARD STEIN, JOHN DIVELLO, MICHAEL          Jury Trial Demanded
BONURA, JOHN BROWN, JOHN WALDRON, ROBERT
VON WERNE, JAMES P. GILROY, and THOMAS               Docket No. 2:13-CV-5651
WALKER (all in their official and individual capacities),

               Defendants.

---------------------------------------------------------------------X

     Plaintiffs, MICHAEL DOLAN, SR., and MICHAEL DOLAN, JR., by their attorneys,

Leeds Brown Law, P.C., complaining of Defendants herein, allege, upon knowledge as to

themselves and their own actions, and upon information and belief as to all other matters:

**JURISDICTION AND VENUE**

1. This is a civil action based upon Defendants' violations of the First, Fourth, and

   Fourteenth Amendments to the United States Constitution (as enforced by 42 U.S.C.

   §1983), as well as any other cause of action that can be inferred from the facts set forth

   herein.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and 28 U.S.C.

   §1343(4). The supplemental jurisdiction of the Court, pursuant to 28 U.S.C. §1367, is

   invoked over state law causes of action.

3. Venue is proper pursuant to 28 U.S.C. §1391.

## PARTIES

4. Plaintiff Michael Dolan, Sr. ("Senior.") is a resident of Nassau County, New York.

5. Plaintiff Michael Dolan, Jr. ("Junior") is a resident of Nassau County, New York.

6. Defendant New Hyde Park Fire District ("District") is a municipal fire district organized under the laws of the State of New York and located in Nassau County, New York.

7. Defendant County of Nassau ("Nassau") is a municipal corporation of the State of New York, with its principal place of business at 1550 Franklin Avenue, Mineola, New York.

8. Defendant Richard Stein ("Stein") was and still is a Commissioner of the District serving on the District's Board of Fire Commissioners ("Board"). Therefore, Stein is a final policymaker for the District, charged with and responsible for properly training and supervising employees with respect to employment issues and for supervising department finances. Stein is a resident of the State of New York, County of Nassau. Stein is sued in his official and individual capacities.

9. Defendant John DiVello ("DiVello") was still is a Commissioner of the District serving on the Board. Therefore, DiVello is a final policymaker for the District, charged with and responsible for properly training and supervising employees with respect to employment issues and for supervising department finances. DiVello is a resident of the State of New York, County of Nassau. DiVello is sued in his official and individual capacities.

10. Defendant Michael Bonura ("Bonura") was and still is a Commissioner of the District serving on the Board. Therefore, Bonura is a final policymaker for the District, charged with and responsible for properly training and supervising employees with respect to employment issues and for supervising department finances. Bonura is a resident of the

State of New York, County of Nassau. Bonura is sued in his official and individual capacities.

11. Defendant John Brown ("Brown") was, during relevant times, a Commissioner of the District serving on the Board. Therefore, Brown was a final policymaker for the District, charged with and responsible for properly training and supervising employees with respect to employment issues and for supervising department finances. Brown is a resident of the State of New York, County of Nassau. Brown is sued in his official and individual capacities.

12. Defendant John Waldron ("Waldron") was and still is a Commissioner of the District serving on the Board. Therefore, Waldron is a final policymaker for the District, charged with and responsible for properly training and supervising employees with respect to employment issues and for supervising department finances. Waldron is a resident of the State of New York, County of Nassau. Waldron is sued in his official and individual capacities.

13. Defendant Robert Von Werne was at all relevant times on the Chief's staff. Von Werne is a resident of Nassau County. Von Werne is sued in his official and individual capacities.

14. Defendant James P. Gilroy ("Gilroy") is a detective in the Nassau County Police Department ("NCPD"). Gilroy works in the State of New York, County of Nassau. Gilroy is sued in his official and individual capacities.

15. Defendant Thomas Walker ("Walker") is a detective in the NCPD. Walker works in the State of New York, County of Nassau. Walker is sued in his official and individual capacities.

## FACTS

### New Hyde Park Fire Department

16. The New Hyde Park Fire Department ("Department") operates under the authority and control of the District, which has established certain rules and regulations under which the Department and its members are authorized to operate as a volunteer fire department.

17. The District is governed by a five-member Board of Fire Commissioners ("Board"), who are elected officials.

18. Commissioners are not required to be members of the Department, but members of the Department may be elected as Commissioners, as may any resident of the New Hyde Park Fire District.

19. Pursuant to the Department by-laws and as authorized by the District, the Department is divided into five companies: Enterprise Engine, Estates, Protection, Rescue, and Hook and Ladder. Each company is assigned apparatus for which they are responsible.

20. Each company also maintains its own by-laws and elects its own command structure, which is subordinate to Departmentally-elected officers, who report to the Board.

21. Every member of the Department must join a specific company.

### Michael Dolan, Sr.

22. In 1967, Senior joined the Department. Prior to becoming an active member, Senior served in the United States Army in Vietnam, earning a Purple Heart.

23. For nearly 50 years, Senior participated as an active member of the Department's Enterprise Engine Company.

24. Senior rose through the ranks of the Department, holding positions as lieutenant, deputy chief, and chief.

25. Senior also served as a Nassau County Fire Commissioner.

26. Throughout his years of volunteer service, Senior performed his duties in an exemplary manner.

### Michael Dolan, Jr.

27. In 2001, Junior joined the Department. Junior served as an Infantryman in the United States Marine Corps from 2003-2009. During this period, Junior completed multiple tours in Iraq.

28. Junior is a member of the Hook and Ladder Company.

### Senior Runs for Board against DiVello

29. In fall 2008, Senior announced his intention to campaign for election to the Board.

30. Senior's opponent was DiVello. DiVello was appointed by the Board in June 2008 to fill a vacancy. DiVello's candidacy was endorsed and supported by the Board.

31. In fact, Walter Brooks, then chairman of the Board and a member of the Enterprise Engine Company, openly endorsed DiVello and sent letters of support on his behalf to community groups.

32. Additionally, Von Werne also campaigned on behalf of DiVello, a close personal friend and fellow Estates Company member.

33. On December 9, 2008, Senior lost the election to DiVello.

### Senior Runs for Board against Brooks

34. In 2009, Senior again ran for the Board, this time against Brooks.

35. Brown endorsed Senior.

36. DiVello endorsed Brooks and signed a personal message to potential voters asking them to vote for Brooks.

37. Other Board members, including Stein, also supported Brooks.

38. Stein was a close personal friend of Brooks.

39. In support of Senior, Brown distributed a letter throughout New Hyde Park.

40. The letter alleged that Brooks and the other Board members made a deal with a fellow commissioner, Anthony Fischetti ("Fischetti"), that allowed Fischetti "to resign his position and within weeks of doing so, reward[ed] him with full-time employment in the district."

41. The letter said that "No public posting of the job ever went out nor was anyone else ever interviewed or considered even though this is a civil service position."

42. After analyzing how much Fischetti's employment cost the District, Brown went on to say that, " There are five of us sitting commissioners and you would think that the rest of them would see my outrage and reevaluate their actions, but I was unable to change their vote on this. I don't intend to portray this as criminal behavior, but it is still illegal as to the standards that this board of commissioners has routinely adopted each year as to both ethics and future employment."

43. The "sitting commissioners" referred to in Brown's letter were Brown, Brooks, Stein, Anthony Fischetti, and Roger Sakowich.

44. Brown concluded the letter by saying that he could "go on and on about wasteful behavior and misguided management decisions…", and that "Hiring our friends for employment positions we just created in today's economy [is] not only wrong, but disdainful. Please send a message that you care about reducing costs and vote for Michael Dolan!"

**Senior Wins Election**

45. Senior won the election and took office on January 1, 2010. Thus, as of January 1, 2010, Senior had two roles – he was a publicly-elected commissioner of the District and remained an active member of the Department.

46. Upon information and belief, the Board members who had endorsed Brooks and who were accused of wrongdoing by Brown's letter were upset with Senior's victory.

47. After Senior took his seat on the Board, two controversies developed between him and Board Chairman Stein.

**The HER Room**

48. One point of contention regarded the "HER Room" located at Fire Headquarters.

49. "HER" is an acronym for Hook and Ladder, Enterprise, and Rescue, which are the three companies co-located at the Department Headquarters building, as opposed to the Protection and Estates companies, which are located in their own buildings elsewhere in New Hyde Park.

50. The HER Room is, in fact, a room outfitted with a bar, sofas, chairs, and a television.

51. The bar in the HER Room served alcohol.

52. The Department was not licensed to serve alcohol by the New York State Liquor Authority (Liquor Authority).

53. It was common for members of the Hook and Ladder, Enterprise, and Rescue companies to congregate in the HER Room.

54. Upon information and belief, at one point after Senior was elected, an underage member of the Department became inebriated after drinking in the HER Room.

55. Thereafter, Senior made a motion at a Board meeting to stop serving alcohol in the HER Room.

56. The motion passed 3-2, with Stein voting against Senior's proposal.

57. Following the passage of Senior's motion, Stein was upset with Senior, telling him that he had robbed the Department of a source of morale.

58. Senior's termination of alcohol service in the HER Room was met with anger by Department members, as well.

59. Immediately following the meeting, a member of the Department announced on the public address (PA) system to firefighters who were assembled for a training, "Thank you, Commissioner Dolan, for closing the HER Room and making the firehouse dry."

60. On another occasion following the vote, Senior entered Fire Headquarters and was met with a mocking announcement on the PA system that, "Commissioner Obama is in the building." This was an apparent reference to Senior's perceived attempt to overstep his bounds on the Commission.

61. Senior complained about the PA announcement to the Fire Chief, asking him to urge his members to show respect for the office of Commissioner.

62. Despite Dolan's complaint, on a subsequent occasion Senior entered Fire Headquarters and was met with an announcement on the PA asking, "Is Commissioner Obama there?"

63. Another source of discord between Senior and Stein involved the furniture that had once occupied the HER Room.

64. After Senior was elected as a Commissioner, the Department purchased new furniture for the HER Room. The items that were replaced included oak tables and chairs, barstools, and an ice machine.

65. Senior believed that the furniture removed from the HER Room, instead of being thrown out or donated, was in fact given to Stein's brother, who he believed had placed it in a room located over his business.

66. Upon information and belief, although the room is not a bar that is open to the public, it does serve as a place for the friends of Stein's brother, including Stein, to congregate.

67. During a closed session Board meeting, Senior raised this concern, asking what happened to the furniture that was removed from the HER Room, and alleging that he knew where it went.

68. In response, Stein told Senior "don't worry about" where the furniture went.

69. Upon information and belief, Stein was angry at Dolan for questioning his brother's procurement of furniture from the HER Room.

### **"Comedy Night" Incident**

70. On March 26, 2011, Frances Dolan ("Frances"), wife of Senior and mother of Junior, attended a "Comedy Night" fundraiser hosted by the Enterprise Engine Company. The fundraiser was open to Department members, their families, and members of the public.

71. Frances served as a member of the Department's Ladies Auxiliary ("Auxiliary") for over 40 years, holding positions as president for five terms, vice president, secretary, treasurer, and chaplain.

72. At the end of the event, one Enterprise Engine Company member, George Ruhl, approached Frances and yelled at her in a physically intimidating and verbally offensive manner.

73. On March 29, 2011, Frances wrote a letter to the Department's chief, John Willers ("Willers"), complaining about the incident.

74. On April 19, 2011, Frances complained by letter to the Board about the incident and Willers' handling of her complaints.

75. On May 15, 2011, Willers responded to Frances by letter dismissing her complaint and writing, among other things:

> "While it is agreed that you deserve an apology from Firefighter Ruhl for his actions, I feel that your actions intensified this situation to its current level. I also feel that you owe an apology to the Enterprise Company for your role in the intensification of this situation. This can be done verbally or in written form to the Captain of the Company."

## NYSDHR Filings

76. On June 15, 2011, Frances filed a complaint of discrimination with the New York State Division of Human Rights ("NYSDHR"), based on the events flowing from the Comedy Night. The complaint alleged that Department members were discriminating against her based on her marital status, gender, and national origin.

77. The NYSDHR has jurisdiction over volunteer fire departments under New York Executive Law §296(9)(a).

78. On July 28, 2011, the NYSDHR issued a determination finding that it lacked jurisdiction over the complaint, as their authority covers fire departments only, not auxiliaries of the same.

79. On August 9, 2011, Frances wrote to the NYSDHR, urging them to reconsider their decision.

80. On September 15, 2011, Senior received a box addressed to him at Fire Headquarters. When he opened the package, it contained a pair of plastic testicles.

81. This was an apparent entreaty to Senior to "act like a man" and "control" his wife.

82. On September 16, 2011, Senior filed a complaint about the harassing package with the NCPD.

83. Also on September 16, 2011, Senior filed his own complaint with the NYSDHR, alleging that he was being retaliated against because of the complaint filed by Frances.

84. The NYSDHR re-opened Frances' complaint on November 23, 2011, to consider "whether Complainant's membership in the Ladies Auxiliary of the New Hyde Park Fire Department constitutes membership in a volunteer fire department."

85. The NYSDHR ultimately answered this question in the negative, dismissing Frances' complaint on December 15, 2011.

**Smoke Detector Program**

86. On January 9, 2012, the Board approved a motion instituting a Senior Citizen Smoke Detector Program, whereby the Board would raise funds from community organizations to purchase batteries for smoke detectors in senior citizens' homes. Department members would then assist homeowners with installing the batteries.

87. The program was later expanded to include the purchase and installation of smoke detectors themselves.

88. A flyer advertising the program was later produced by the Department and distributed throughout the community. The flyer stated, "Please note: This program is available during the months of March and April."

89. Senior asked Stein, who was designated to be in charge of the smoke detector program, if he could help distribute the smoke detectors. Stein said Senior could not help, that the program was "his" (referring to Stein), and that Stein would get others to help.

90. On February 27, 2012, Frances re-filed with the NYSDHR, alleging that the Department functioned as a place of public accommodation on the night of the fundraiser, and that therefore the NYSDHR had jurisdiction over her complaint.

91. On April 30, 2012, the Department submitted their position statement to the NYSDHR.

92. Frances filed her rebuttal with the NYSDHR on May 19, 2012.

93. In June 2012, weeks after Frances filed her rebuttal, Senior visited the Nassau County Fire Museum and met with the Museum's chief, John Murray ("Murray").

94. Dolan, Sr. had known Murray for over 30 years.

95. Senior told Murray about the efforts to supply senior citizens with smoke detectors. Murray gave Senior 150 smoke detectors, worth $10 each.

96. Senior intended to distribute the 150 detectors to senior citizens residing in the District.

97. Senior brought the smoke detectors back to the District for safekeeping and put them in a secure room at the firehouse.

98. Senior distributed 24 of the detectors to senior citizens from Cellini Lodge #2206, a New Hyde Park Italian-American social and philanthropic organization.

99. Senior also distributed detectors to senior citizens from Clinton G. Martin Park, a New Hyde Park senior citizen's social organization.

100. Senior subsequently noticed that many of the detectors were missing, so he took the remaining detectors out of the room and brought them to his residence, as he believed someone else was taking them without authorization and for a possibly improper purpose.

101. Later that day, Stein called Senior and asked if he knew where the detectors were. Senior told Stein that he brought them home to protect them, as some had gone missing. Stein asked if Senior intended to return the detectors to the Department. Senior said he would.

102. Senior subsequently placed the detectors back at Department Headquarters.

103. A few days later, Senior noticed that more detectors were missing.

104. On June 21, 2012, Senior returned to the firehouse with Junior.

105. Senior feared that the detectors were being misappropriated, so he and Junior removed the remaining detectors from the District storage room.

106. Senior then took the detectors back to the Fire Museum.

107. Senior told Murray that he was returning the detectors to the Fire Museum because he was concerned that there was no accountability for them, and that some had gone missing.

108. In fact, the Department kept no formal inventory of the detectors that it had distributed.

109. Upon information and belief, sometime after Senior returned the detectors to the Fire Museum, Stein falsely reported to the NCPD that Senior and Junior had stolen 65 smoke detectors from the Department, valued at $3,250.

110. Upon information and belief, when Stein reported the detectors as "stolen", he knew that they had, in fact, been returned to the Fire Museum. Stein was told that the detectors were returned to the Museum by Department Chief Robert Von Werne ("Von Werne"), Fire Museum Director Angelo Catalano, and Murray.

111. In response to Stein's complaint, the NCPD conducted an investigation. The investigation was led by Gilroy and Walker.

112. During the investigation the NCPD determined that the detectors were, in fact, returned to the Fire Museum.

113. During the investigation, Walker asked Murray how much the smoke detectors were worth. Murray told Walker that the units were worth $10 each.

## Arrests

114. Despite having knowledge that the detectors were returned to the Fire Museum, Detectives Gilroy and Walker arrested Senior on July 15, 2012, charging him with Grand Larceny in the Third Degree, a felony.

115. Senior was detained against his will in a cell for approximately 21 hours, during which time he was handcuffed with his arm extended above him.

116. The next day, July 16, 2012, Junior was arrested by Walker after his voluntarily surrender at the NCPD.

117. Junior was charged with the same felony crime as Senior.

118. Junior was detained against his will in a cell for approximately 18 hours, during which time he was handcuffed with his arm extended above him.

119. Grand Larceny in the Third Degree applies when the value of the allegedly stolen property exceeds $3,000.

120. The felony complaint against Senior was written by Gilroy, stating:

> TO WIT: On the aforementioned date, time and place of occurrence, Michael Senior, along with a not yet apprehended male, did remove 65 Kidde smoke detectors from a room within the New Hyde Park Fire Department. The Defendant did not have permission or authority to remove the smoke detectors. The total value of the smoke detectors removed is $3,250.00.

121. The felony complaint against Junior was written by Walker, stating:

> TO WIT: On the aforementioned date, time and place of occurrence, Michael J. Dolan, along with Defendant, Michael Dolan, did remove 65 Kidde smoke detectors from a room within the New Hyde Park Fire Department. The Defendant did not have permission or authority to remove the smoke detectors. The total value of the smoke detectors removed is $3,250.00.

122.  According to the felony complaints, each detector was worth $50. However, the Detectives had been told by Murray that the detectors were worth $10 each. Accordingly, they could not have had reasonable suspicion or probable cause to believe that Senior and Junior could be guilty of the crime for which they were charged.

123.  In fact, had the officers correctly valued the detectors at $10 each, the total value of 65 detectors would have been $650.

124.  The charge for theft of property valued at $650 is petit larceny, a misdemeanor.

125.  Upon information and belief, Stein told the NCPD that the detectors were valued at $50 each. By falsely overstating the value of the detectors, the Plaintiffs were charged with felonies rather than misdemeanors.

126.  Pursuant to the District's rules and regulations, if a member is convicted of a felony, such member "shall be automatically dropped from membership." Accordingly, if Senior or Junior were convicted they would have been terminated by the Department.

127.  Furthermore, Senior was informed by Joseph Frank ("Frank"), legal counsel for the District, that if he was convicted of a felony he would be removed from his position as a Commissioner. While this is an oversimplification of New York Public Officers Law §36, it is apparent that the Board believed it to be true.

128.  Therefore, Stein and the Board believed that if Senior was convicted of a felony he would be removed from the Board.

129.  Reports of the Plaintiffs' arrests were carried in various news outlets. For example, on July 18, 2012, Newsday ran an article about the arrest of Senior and Junior. Accompanying the article were the Plaintiffs' mugshots.

130. On July 19, 2012, The Island Now news website also ran photos of the Plaintiffs' mugshots, under the headline, "NHP firemen cited for grand larceny".

131. Before being charged with felony grand larceny, Michael, Jr. had applied for jobs with both the New York State Police and the New York State Department of Corrections.

132. Michael, Jr. met with each of these agencies while his charges were pending. Both knew about the pending charges, and both declined to hire him.

### Suspensions as Members

133. On July 20, 2012, the Plaintiffs received a letter from Von Werne.

134. Von Werne's letter informed the Plaintiffs that they were suspended as members of the Department at the behest of the Board.

135. The Plaintiffs' suspensions from the Department denied them the terms, conditions, and privileges of volunteer employment, including access to Department facilities, the ability to respond to emergency calls as members of the Department, and New York State Volunteer Firefighter's Length of Service Award Program pension credit.

136. On August 21, 2012, the Board met in closed session and considered the matter of the suspensions. The Board voted to continue the suspensions, but did note vote on whether to issue formal disciplinary charges.

137. On August 23, 2012, Frank sent Senior a letter of continuing suspension and pending disciplinary action.

138. The Board members voting in favor of continuing the suspensions were Stein, Bonura, and Brown.

139. Despite the mandates of New York Open Meeting Law (Public Officers Law, Article 7), Senior was excluded from the closed session.

## Dismissal of Criminal Charges

140. On October 12, 2012, the Nassau County District Attorney's Office ("DA") moved to dismiss the charges against both Senior and Junior.

141. At a Court hearing on that date, with respect to Senior, Nassau County District Court Judge Susan T. Kluewer and Nassau County Assistant District Attorney Christiana McSloy engaged in the following discussion:

> *Judge Kleuwer: Are you making this application as - - because you do not believe that there is reasonable cause to believe the defendant committed a felony, is that correct?*
>
> *Ms. McSloy: That is correct, your Honor.*
>
> *Judge Kleuwer: It is also my understanding from our bench conference you don't really have reasonable cause to believe that the defendant committed a misdemeanor and it is your intention to move to dismiss the charge?*
>
> *Ms. McSloy: That is correct, your Honor.*

142. As to Junior, Ms. McSloy told Judge Kleuwer:

> *"We do not believe that there is legally sufficient evidence for a felony in this matter and we also do not believe that there is legally sufficient evidence to proceed to trial on a misdemeanor."*

143. Judge Kleuwer granted the motions to dismiss the charges against both Senior and Junior under New York Criminal Procedure Law §160.50, "Order Upon Termination of Criminal Action in Favor of the Accused."

144. Less than one week later, on October 18, 2012, apparently disappointed by the dismissal of charges against Senior and Junior, the Enterprise Engine Company distributed an invitation to company members for a "Morale Booster" to be held in the HER Room on October 26, 2012.

**Departmental Charges**

145. On October 16, 2012, just four days after the DA determined it did not have reasonable cause to support its charges and the criminal complaints were dismissed in favor of the Plaintiffs, the Board nonetheless met in closed session and issued Departmental charges against Senior and Junior.

146. The four charges issued against Senior and Junior alleged that they had violated various Department regulations by the "unauthorized removal" of 65 smoke detectors from Department property.

147. Charge number two alleged that the Plaintiffs had removed the detectors "for personal use." Charge number three alleged that Plaintiffs had used their position with the Department "for personal or private gain."

148. These charges were levied against the Plaintiffs despite the fact that the Board knew, at that point, that the detectors had been returned to the Fire Museum, not taken for personal use or private gain.

149. The Board members voting to issue the charges were Brown, DiVello, and Bonura.

150. Despite the mandates of New York Open Meeting Law (Public Officers Law, Article 7), Senior was excluded from the closed session.

151. Under Department regulations, a finding on any one of the charges could lead to dismissal from the Department.

152. A hearing on the charges was held on January 7-8, 2013 before Hearing Officer Walter P. Wagner ("Wagner").

153. During the hearing, Stein stated that he "[doesn't] like the way [Senior] handles himself as a Fire Commissioner", and that he "wasn't thrilled" when he learned that the DA had dropped the charges against the Plaintiffs.

154. On February 28, 2013, Wagner issued a report and recommendation to the Board.

155. Wagner recommended that Senior "be removed as a member of the New Hyde Park Fire District."

156. As to Junior, Wagner's report found no wrongdoing, and recommended "neither suspension nor removal."

157. On April 8, 2013, Commissioners Bonura, DiVello, and Waldron voted to approve the recommendation of the hearing officer, removing Senior as an active member of the Department. Senior, however, continued to serve in his elected capacity as a Commissioner.

158. At the same time, they voted to restore Junior to full duty.

159. Despite being restored to full duty status, the Department did not immediately return Junior's bunker gear and personal gear.

160. On April 21, 2013, Junior's counsel sent a letter of complaint to the Department about the delay in returning his equipment.

161. Junior's gear was finally returned to him approximately 7 weeks after he was reinstated to the Department.

162. Senior subsequently appealed his dismissal pursuant to New York CPLR Article 78.

163. On December 6, 2013, Nassau County Supreme Court Justice James P. McCormack ruled in Senior's favor, finding that, "There is no evidence in the record that Commissioner Dolan took the 65 smoke detectors for his own personal use or gain", and

that "By both bringing the charges and ratifying the determination based on those

charges, the petitioner's substantive rights to due process were severely compromised."

164. Despite the ruling of Justice McCormack, however, Senior has still not been restored to

membership in the Department. Instead, the Board has denied his reinstatement while

they consider an appeal of Justice McCormack's order.

## AS AND FOR A FIRST CAUSE OF ACTION
### (First Amendment Retaliation – Political Activity)

165. Defendants Stein, DiVello, Bonura, Brown, Waldron, and Von Werne, acting under color

of state law, denied Plaintiffs terms, conditions and privileges of volunteer employment

(including access to Department facilities, the ability to respond to emergency calls as a

member of the Department, and New York State Volunteer Firefighter's Length of

Service Award Program pension credit), and also subjected Plaintiffs to adverse actions

based on the political activity of Senior in opposition to the Board, in violation of the

First Amendment to the United States Constitution, as enforced by 42 U.S.C. §1983.

166. Defendant District, while acting under color of state law, deprived Plaintiffs of their

constitutional rights, as secured by the First Amendment to the United States

Constitution, as enforced by 42 U.S.C. §1983. District intentionally committed, condoned

or was deliberately indifferent to the aforementioned violations of Plaintiffs'

constitutional right to engage in political activities. Such deliberate indifference may be

inferred because policymakers, such as, Stein, DiVello, Bonura, Brown, and Waldron

engaged in and/or tacitly condoned the violation of Plaintiffs' rights, as described above.

## AS AND FOR A SECOND CAUSE OF ACTION
### (First Amendment Retaliation and Fourteenth Amendment – Intimate Association)

167. Defendants Stein, DiVello, Bonura, Brown, Waldron, and Von Werne, acting under color

of state law, denied Plaintiffs terms, conditions and privileges of volunteer employment (including access to Department facilities, the ability to respond to emergency calls as a member of the Department, and New York State Volunteer Firefighter's Length of Service Award Program pension credit), and subjected Plaintiffs to adverse actions in retaliation for their association with Frances Dolan, who expressed her right to petition the government in redress of grievances by filing a complaint with the NYSDHR and by participating in the NYSDHR process. Defendants' actions were in violation of the First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. §1983.

168.   Defendant District has, while acting under color of state law, deprived Plaintiffs of their constitutional rights, as secured by the First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. §1983. District intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiffs' constitutional right to intimate association. Such deliberate indifference may be inferred because policymakers, such as, Stein, DiVello, Bonura, Brown, and Waldron engaged in and/or tacitly condoned the violation of Plaintiffs' rights, as described above.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Abuse of Process)

169.   Defendants Stein, DiVello, Bonura, and Brown, acting under color of state law, caused the NCPD to arrest Plaintiffs and charge them with felonies without proper cause and for the ulterior motive of creating sufficient cause to terminate Plaintiffs' employment in violation of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. §1983 and the Constitution and Laws of the State of New York State.

170.   Defendant District has, while acting under color of state law, deprived Plaintiffs of their

constitutional rights, as secured by the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. §1983. Defendant intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiffs' constitutional rights. Such deliberate indifference may be inferred because policymakers, such as, Stein, DiVello, Bonura, and Brown, engaged in and/or tacitly condoned the violation of Plaintiffs' rights, as described above.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Malicious Prosecution)**

171.    Defendants Stein, DiVello, Bonura, and Brown, acting under color of state law, caused the NCPD to arrest Plaintiffs and charge them with felonies without proper cause and allowed the DA to prosecute Plaintiffs without probable cause and while knowing the value of the detectors did not support the crime as charged, in violation of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. §1983, and the Constitution and Laws of the State of New York State. Further, Defendants acted with malice and with the intent to have Plaintiffs expelled from the Department.

172.    Defendant District has, while acting under color of state law, deprived Plaintiffs of their constitutional rights, as secured by the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. §1983. Defendants intentionally committed, condoned or were deliberately indifferent to the aforementioned violations of Plaintiffs' constitutional rights. Such deliberate indifference may be inferred in the following way: Policymakers, such as, Stein, DiVello, Bonura, and Brown, engaged in and/or tacitly condoned the violation of Plaintiffs' rights, as described above.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (False Arrest/False Imprisonment)

173.    Defendants Gilroy and Walker, acting under color of state law, arrested and

detained Plaintiffs against their will without proper cause for the crimes charged in

violation of the Fourth Amendment to the United States Constitution, as enforced by 42

U.S.C. §1983 and the Constitution and Laws of the State of New York State.

174.    Defendant County has, while acting under color of state law, deprived Plaintiffs of their

constitutional rights, as secured by the Fourth Amendment to the United States

Constitution, as enforced by 42 U.S.C. §1983. Defendant intentionally committed,

condoned or was deliberately indifferent to the aforementioned violations of Plaintiffs'

constitutional rights.


WHEREFORE, Plaintiffs demand judgment against all Defendants in the form of and/or for

compensatory, emotional, physical, and punitive damages (where applicable), interest, injunctive

relief, and any other damages permitted by law. Plaintiffs also demand judgment against

Defendants for each cause action and for all applicable and permissible damages, in an amount to

be assessed at the time of trial. Plaintiffs further seek injunctive relief, including but not limited

to the clearing of their personnel files of any wrongful disciplinary actions, immediate

reinstatement (as to Senior), and a permanent injunction enjoining all Defendants and their

agents from any further actions abridging Plaintiffs' rights. Plaintiffs further demand all

attorneys' fees, disbursements and other costs and all further relief, equitable or otherwise, to

which Plaintiffs are entitled and/or which the court deems just and proper.

Dated: Carle Place, New York
      March 14, 2014

                    LEEDS BROWN LAW, P.C.
                    Attorneys for Plaintiff
                    One Old Country Road, Suite 347
                    Carle Place, New York 11514
                    (516) 873-9550

                    _____/s/_____
                    RICK OSTROVE
                    ANDREW COSTELLO